1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                     FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   WAEL QAHHAZ,                                No.  2:13-cf-2338 GEB DAD P

12                  Petitioner,

13          v.

14   CONNIE GIBSON, Warden,                      FINDINGS AND RECOMMENDATIONS

15                  Respondent.

16

17          Petitioner is a state prisoner proceeding pro se with a petition for a writ of habeas corpus

18   pursuant to 28 U.S.C. § 2254.  Petitioner challenges a judgment of conviction entered against him

19   on October 21, 2013, in the Solano County Superior Court on charges of two counts of forcible

20   penetration with a foreign object.  He seeks federal habeas relief on the grounds that the evidence

21   introduced at his trial was insufficient to support the conviction and the trial court violated his

22   Sixth Amendment rights when it failed to hold a hearing after he requested the appointment of

23   substitute counsel.  Upon careful consideration of the record and the applicable law, the

24   undersigned will recommend that petitioner's application for habeas corpus relief be denied.

25   **I. Background**

26          In its unpublished memorandum and opinion affirming petitioner's judgment of

27   conviction on appeal, the California Court of Appeal for the First Appellate District provided the

28   following factual summary:

1

Defendant Wael R. Qahhaz, a visitor in the 72–year–old victim's apartment, suddenly surprised her while she was preparing tea.  He sexually assaulted her multiple times as they struggled throughout the apartment and she tried to escape from him.

A jury found defendant guilty of two counts of forcible penetration with a foreign object (Pen. Code, § 289) and found true certain enhancement allegations.  The court found true defendant had suffered a prior serious felony conviction for making criminal threats.  Defendant was sentenced to 67 years to life in prison.  On appeal, defendant's arguments include claims of Marsden[1] error, denial of his right to testify, instructional error, evidentiary error, insufficiency of the evidence to prove the prior conviction, and abuse of discretion in denying a Romero[2] motion to dismiss the prior strike conviction.  As we explain below, we reject defendant's contentions and affirm the judgment.

**STATEMENT OF THE CASE**

By amended information, defendant was charged with two counts of forcible sexual penetration with a foreign object on S.J. (Pen. Code, § 289, subd. (a)(1).)[3]  The information also alleged that defendant reasonably should have known that the victim was 65 years old or older, and that he committed the second offense during the commission of a first degree burglary with intent to commit sexual penetration.  (§§ 667.9, subd. (a), 667.61, subds. (a) & (d).)  Finally, the information alleged that defendant had a prior strike conviction.  (§§ 667, subd. (a), 1170.12, subds. (a)–(d)/ 667, subds. (b)–(i).)  Jury trial commenced April 12, 2010, and concluded April 19, 2010 with guilty verdicts and true findings on all charges and allegations.

On October 21, 2010, the court sentenced defendant to 67 years to life in state prison.  Defendant timely appeals.

**STATEMENT OF FACTS**

In 2009, S.J. lived alone in a one–bedroom apartment located in a senior citizen housing complex in Vallejo.  Defendant, whom she knew as Willy, also lived in the complex, and S.J. would see him around the complex and say hello to him.  Defendant visited S.J. in her apartment twice in the two weeks before September 21.  She told defendant she was 72, and defendant said he was 56.  During both of those visits, defendant offered to rub her neck, but S.J. declined.  There was no physical contact between them.  Defendant was a one–legged amputee who used an electric wheelchair.

---

[1]  People v. Marsden (1970) 2 Cal.3d 118 (Marsden).

[2]  People v. Superior Court (Romero) (1996) 13 Cal.4th 497 (Romero).

[3]  Unless otherwise indicated, all statutory references are to the Penal Code.

2

**Prosecution Case**

On September 21, 2009, between 5:00 and 5:30 p.m., defendant rang S.J.'s doorbell and asked her if he could come in. She was reluctant to let him in because she had been feeling sad, as September 21 is her deceased son's birthday. Defendant said he would stay just a few minutes, so she let him in.

S.J. was in the kitchen making tea when, all of a sudden, she felt herself being pulled back hard by the belt of her slacks. She fell into defendant's lap and both fell to the floor as the wheelchair tipped over. S.J. was on her back and they "wrestled for a little bit." Defendant "was trying to kiss me, and I was trying to keep my mouth closed, and I bit myself" on the lip. Defendant kept saying, "I wanna come, I wanna come," while S.J. kept saying "Stop. Stop. Please, no." Defendant pulled S.J.'s pants down and very "forceful[ly]" "inserted his hand into my vagina . . . one finger in the vagina and one in the anus." Defendant kept his fingers inside her, "moving, moving" them for about half a minute. He cut her vagina with his fingernails, causing her to bleed and feel pain. He was very strong, much stronger than she was. At some point, defendant removed the shorts he was wearing. After penetrating her digitally, he put hand lotion from her kitchen counter on his penis and around her vagina. He was on top of her and his face was red and full of perspiration. S.J. punched him in the face.

Somehow, S.J. was able to get away from defendant by scooting backwards on her elbows and standing up. Her pants were around her knees, but she was able to get up and run to the bathroom in her bedroom. She noticed she was bleeding from the vagina and had blood spots on her underwear. Defendant followed her, hopping, and telling her to stop. She tried to shut the bathroom door and lock herself in, but defendant "was pushing on the door with his hands" and she was unable to lock the door. He left a handprint on the dress mirror hanging on the bathroom door.

Defendant pushed open the door, pulled her out of the bathroom, and hopped through the bedroom and living room back into the kitchen with her, where he pushed S.J. down to the floor. He then pulled her pants all the way down and again forcefully inserted his fingers into her vagina and anus, hurting her. This time, S.J. was able to crawl on her hands and knees back to the bedroom and lock the door.

S.J. stayed in her bedroom a long time because she never heard him leave. When she eventually came out and discovered he was gone, S.J. showered "to get clean." She did not call the police, and was not going to tell anyone, because she "felt such shame and didn't want it known around where I live." However, when her daughter called her at approximately 10:00 p.m. and "she could tell there was something wrong," S.J. told her daughter what had happened. S.J.'s daughter encouraged her to call the police. S.J. called 9–1–1. The dispatcher was "kind of rude," and that upset S.J. S.J. told the dispatcher she had not been penetrated because she "wanted [the dispatcher] to know, it was not with his penis, but with his fingers."

When the police arrived, she gave a statement to Officer Herndon. She gave the police the clothing she had on, and went to the hospital for an examination.

The police officers went to defendant's apartment.   Defendant answered the door while sitting in an electric wheelchair.   Informed that the police were there to talk to him about the assault on S.J., defendant said he would come outside because he did not want to talk in front of his girlfriend.   Defendant then got out of the wheelchair without difficulty and hopped outside, moving really well.   Defendant denied assaulting S.J.

Defendant was taken to the hospital, where he had no trouble putting on a hospital gown, or hopping over to the examination table.   After waiving his Miranda[4] rights, defendant told police that he was 46 years old.   He said S.J. had called him and invited him to come by to talk and buy some tea.   He was at S.J's apartment for no more than two minutes and never touched or assaulted her.   He had no explanation for her injuries.   Defendant was arrested and his clothes were collected as evidence.

S.J. was examined by a nurse trained and qualified as an expert in sexual assault examinations.   S.J. told the nurse what had happened. Her statement was consistent with what she told the police.   The nurse observed an abrasion on S.J.'s lower lip, multiple sub–mucosal hemorrhages on her breasts, lacerations on her inner thighs along the panty line, and above that on one side an abrasion where some skin had been scraped off.   There were bruises on S.J.'s forearms, wrists, and elbow, and she complained of pain in her right arm.   In addition, the nurse noted a laceration on the posterior fourchet (the bottom portion of the vaginal area), and two abrasions on her hymen.   The nurse took a saliva swab from S.J.

The same nurse examined defendant, collected his clothing, and took a saliva swab from him.

An expert in forensic DNA analysis and DNA statistics examined S.J.'s underwear and determined there was human blood on them. He examined defendant's shirt and determined that the blood stains on the right shoulder matched S.J.'s DNA profile.   He also analyzed a swab from a mirror and determined that the DNA matched S.J.'s profile.   There was also a trace amount of male DNA.   According to the expert, fingerprints generally do not carry a lot of DNA, but cells in the vaginal vault do.   He opined that the amount of DNA he found was consistent with someone putting a finger inside a vagina. There was not enough male DNA to establish a donor.

**Defense Case**

Defendant did not testify.   The defense called as an expert witness a certified sexual assault nurse and forensic examiner who reviewed the findings made by the prosecution's sexual assault nurse examiner.   According to the defense expert, there is no way to

---

[4]   Miranda v. Arizona (1966) 384 U.S. 436 (Miranda).

4

determine if an injury is caused by consensual or nonconsensual sex. She criticized the prosecution expert's documentation as confusing and conflicting, concluding that "there's a lot wrong with the way the documentation was done or not done." According to the defense expert, there were no abrasions or tearing on the hymen: at most there was redness. On the posterior fourchet she did see an area that was abraded. Abrasions are friction type injuries that are caused by rubbing. The posterior fourchet "is still called external genitalia. It's not actually into the vaginal canal." She did not see any bleeding associated with these injuries. She did not see any laceration of the posterior fourchet. The injuries on the "inner thighs" were actually on the gluteal fold and could have been caused by the elastic on the underwear. "Those areas were abraded and looked as if they could have had a little oozy–type bleeding going on."

The defense expert acknowledged that the injuries were consistent with digital penetration, but maintained that the injuries S.J. sustained could have been caused by consensual or nonconsensual sex. She testified that the decrease in hormones after menopause make the tissues in the genital area dryer, thinner and more fragile and, therefore, more susceptible to injury.

The defense also called as a character witness a woman who lived in the same apartment complex and had known defendant for two years. She described their relationship as "good friends." He had been to her apartment many times and had always been a complete gentleman, never violent or threatening towards her, and very helpful when her car had broken down. She was not aware that defendant had been convicted of making felony criminal threats in 1997, but it did not change her opinion of him.

People v. Qahhaz, No. A130398, 2012 WL 4459579 (Cal. App. 1 Dist. Sept. 27, 2012).

After the California Court of Appeal affirmed petitioner's judgment of conviction on appeal, he filed a petition for review in the California Supreme Court. That petition was summarily denied by order dated January 23, 2013. (ECF No. 19-4 at 525.)

On August 7, 2013, petitioner filed a petition for writ of habeas corpus in the California Supreme Court, claiming that: (1) the evidence introduced at his trial was insufficient to support his convictions; (2) the trial court improperly denied his requests for substitute counsel; and (3) his trial counsel rendered ineffective assistance. (ECF No. 19-4 at 527-38.) On October 23, 2013, the Supreme Court denied that habeas petition, citing the decisions in People v. Duvall, 9 Cal.4th 464, 474 (1995) (a petitioner seeking habeas relief must "state fully and with particularity the facts on which relief is sought" and must "include copies of reasonably available documentary evidence supporting the claim"); In re Waltreus, 62 Cal.2d 218, 225 (1965) (issues actually raised

5

1    and rejected on appeal cannot be raised again in a state habeas petition); In re Dixon, 41 Cal.2d

2    756, 759 (1953) (a writ of habeas corpus is not available where the claimed errors could have

3    been, but were not, raised on appeal); In re Swain, 34 Cal.2d 300, 304 (1949) (a habeas petitioner

4    must "allege with particularity the facts upon which he would have a final judgment overturned"

5    and must "fully disclose his reasons for delaying in the presentation of those facts"); and In re

6    Lindley, 29 Cal.2d 709, 723 (1947) (habeas corpus is not available to retry issues of fact or the

7    merits of a defense, the sufficiency of the evidence to support the petitioner's conviction, the trial

8    court's admission or exclusion of evidence, or other errors of procedure occurring during the

9    trial).  (ECF No. 19-4 at 538.)

10        Petitioner filed his federal habeas petition in this court on November 12, 2013.  (ECF No.

11   1.)

12   **II.  Standards of Review Applicable to Habeas Corpus Claims**

13        An application for a writ of habeas corpus by a person in custody under a judgment of a

14   state court can be granted only for violations of the Constitution or laws of the United States.  28

15   U.S.C. § 2254(a).  A federal writ is not available for alleged error in the interpretation or

16   application of state law.  See Wilson v. Corcoran, 562 U.S. 1, ___, 131 S. Ct. 13, 16 (2010);

17   Estelle v. McGuire, 502 U.S. 62, 67-68 (1991); Park v. California, 202 F.3d 1146, 1149 (9th Cir.

18   2000).

19        Title 28 U.S.C. § 2254(d) sets forth the following standards for granting federal habeas

20   corpus relief:

21             An application for a writ of habeas corpus on behalf of a
        person in custody pursuant to the judgment of a State court shall not
22      be granted with respect to any claim that was adjudicated on the
        merits in State court proceedings unless the adjudication of the
23      claim -

24             (1) resulted in a decision that was contrary to, or involved
        an unreasonable application of, clearly established Federal law, as
25      determined by the Supreme Court of the United States; or

26             (2) resulted in a decision that was based on an unreasonable
        determination of the facts in light of the evidence presented in the
27      State court proceeding.

28   /////

6

For purposes of applying § 2254(d)(1), "clearly established federal law" consists of holdings of the United States Supreme Court at the time of the last reasoned state court decision. Greene v. Fisher, ___ U.S. ___, 132 S. Ct. 38, 44 (2011); Stanley v. Cullen, 633 F.3d 852, 859 (9th Cir. 2011) (citing Williams v. Taylor, 529 U.S. 362, 405-06 (2000)).  Circuit court precedent "may be persuasive in determining what law is clearly established and whether a state court applied that law unreasonably."  Stanley, 633 F.3d at 859 (quoting Maxwell v. Roe, 606 F.3d 561, 567 (9th Cir. 2010)).  However, circuit precedent may not be "used to refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule that th[e] [Supreme] Court has not announced."  Marshall v. Rodgers, ___ U.S. ___, ___, 133 S. Ct. 1446, 1450 (2013) (citing Parker v. Matthews, ___ U.S. ___, ___, 132 S. Ct. 2148, 2155 (2012)).  Nor may it be used to "determine whether a particular rule of law is so widely accepted among the Federal Circuits that it would, if presented to th[e] [Supreme] Court, be accepted as correct.  Id.  Further, where courts of appeals have diverged in their treatment of an issue, it cannot be said that there is "clearly established Federal law" governing that issue.  Carey v. Musladin, 549 U.S. 70, 77 (2006).

A state court decision is "contrary to" clearly established federal law if it applies a rule contradicting a holding of the Supreme Court or reaches a result different from Supreme Court precedent on "materially indistinguishable" facts.  Price v. Vincent, 538 U.S. 634, 640 (2003).  Under the "unreasonable application" clause of § 2254(d)(1), a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the prisoner's case.[5]  Lockyer v. Andrade, 538 U.S. 63, 75 (2003); Williams, 529 U.S. at 413; Chia v. Cambra, 360 F.3d 997, 1002 (9th Cir. 2004).  A federal habeas court "may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable."  Williams, 529 U.S. at 412.  See also Schriro v. Landrigan, 550 U.S. 465, 473

---

[5]  Under § 2254(d)(2), a state court decision based on a factual determination is not to be overturned on factual grounds unless it is "objectively unreasonable in light of the evidence presented in the state court proceeding."  Stanley, 633 F.3d at 859 (quoting Davis v. Woodford, 384 F.3d 628, 638 (9th Cir. 2004)).

1   (2007); Lockyer, 538 U.S. at 75 (it is "not enough that a federal habeas court, in its independent

2   review of the legal question, is left with a 'firm conviction' that the state court was 'erroneous.'")

3   "A state court's determination that a claim lacks merit precludes federal habeas relief so long as

4   'fairminded jurists could disagree' on the correctness of the state court's decision." Harrington v.

5   Richter, 562 U.S.___,___,131 S. Ct. 770, 786 (2011) (quoting Yarborough v. Alvarado, 541 U.S.

6   652, 664 (2004)). Accordingly, "[a]s a condition for obtaining habeas corpus from a federal

7   court, a state prisoner must show that the state court's ruling on the claim being presented in

8   federal court was so lacking in justification that there was an error well understood and

9   comprehended in existing law beyond any possibility for fairminded disagreement." Richter,131

10  S. Ct. at 786-87.

11        If the state court's decision does not meet the criteria set forth in § 2254(d), a reviewing

12  court must conduct a de novo review of a habeas petitioner's claims. Delgadillo v. Woodford,

13  527 F.3d 919, 925 (9th Cir. 2008); see also Frantz v. Hazey, 533 F.3d 724, 735 (9th Cir. 2008)

14  (en banc) ("[I]t is now clear both that we may not grant habeas relief simply because of §

15  2254(d)(1) error and that, if there is such error, we must decide the habeas petition by considering

16  de novo the constitutional issues raised.").

17        The court looks to the last reasoned state court decision as the basis for the state court

18  judgment. Stanley, 633 F.3d at 859; Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004).

19  If the last reasoned state court decision adopts or substantially incorporates the reasoning from a

20  previous state court decision, this court may consider both decisions to ascertain the reasoning of

21  the last decision. Edwards v. Lamarque, 475 F.3d 1121, 1126 (9th Cir. 2007) (en banc). "When a

22  federal claim has been presented to a state court and the state court has denied relief, it may be

23  presumed that the state court adjudicated the claim on the merits in the absence of any indication

24  or state-law procedural principles to the contrary." Richter, 131 S. Ct. at 784-85. This

25  presumption may be overcome by a showing "there is reason to think some other explanation for

26  the state court's decision is more likely." Id. at 785 (citing Ylst v. Nunnemaker, 501 U.S. 797,

27  803 (1991). Similarly, when a state court decision on a petitioner's claims rejects some claims

28  but does not expressly address a federal claim, a federal habeas court must presume, subject to

8

1   rebuttal, that the federal claim was adjudicated on the merits.  Johnson v. Williams, ___ U.S. ___,

2   ___, 133 S. Ct. 1088, 1091 (2013).

3          Where the state court reaches a decision on the merits but provides no reasoning to

4   support its conclusion, a federal habeas court independently reviews the record to determine

5   whether habeas corpus relief is available under § 2254(d).  Stanley, 633 F.3d at 860; Himes v.

6   Thompson, 336 F.3d 848, 853 (9th Cir. 2003).   "Independent review of the record is not de novo

7   review of the constitutional issue, but rather, the only method by which we can determine whether

8   a silent state court decision is objectively unreasonable."  Himes, 336 F.3d at 853.  Where no

9   reasoned decision is available, the habeas petitioner still has the burden of "showing there was no

10  reasonable basis for the state court to deny relief."  Richter, 131 S. Ct. at 784.

11         A summary denial is presumed to be a denial on the merits of the petitioner's claims.

12  Stancle v. Clay, 692 F.3d 948, 957 & n. 3 (9th Cir. 2012).  While the federal court cannot analyze

13  just what the state court did when it issued a summary denial, the federal court must review the

14  state court record to determine whether there was any "reasonable basis for the state court to deny

15  relief."  Richter, 131 S. Ct. at 784.  This court "must determine what arguments or theories . . .

16  could have supported, the state court's decision; and then it must ask whether it is possible

17  fairminded jurists could disagree that those arguments or theories are inconsistent with the

18  holding in a prior decision of [the Supreme] Court."  Id. at 786.  The petitioner bears "the burden

19  to demonstrate that 'there was no reasonable basis for the state court to deny relief.'"  Walker v.

20  Martel, 709 F.3d 925, 939 (9th Cir. 2013) (quoting Richter, 131 S. Ct. at 784).

21         When it is clear, however, that a state court has not reached the merits of a petitioner's

22  claim, the deferential standard set forth in 28 U.S.C. § 2254(d) does not apply and a federal

23  habeas court must review the claim de novo.  Stanley, 633 F.3d at 860; Reynoso v. Giurbino, 462

24  F.3d 1099, 1109 (9th Cir. 2006); Nulph v. Cook, 333 F.3d 1052, 1056 (9th Cir. 2003).

25  /////

26  /////

27  /////

28  /////

9

1    **III.  Petitioner's Claims**

2        **A.  Insufficient Evidence**

3        In his first claim for relief, petitioner argues that the evidence introduced at his trial was

4    insufficient to support his conviction on "any of the alleged charges."  (ECF No. 1 at 4.)[6]

5    Petitioner contends that he was "convicted without solid real evidence, like DNA, medical and/or

6    physical evidence." (Id.)  Petitioner notes that the prosecution's sexual assault expert  testified

7    that she "could not be 100% certain that the [victim's] injuries were caused by a sexual assault."

8    (Id. at 16; ECF No. 19-3 at 437-38.)  Petitioner further notes that this same expert witness

9    testified that a medical examination of petitioner's body turned up "no findings."  (ECF No. 1 at

10   30-31.)  Petitioner argues there was "reason to dispute" the victim's testimony as to what

11   occurred and that "reasonable doubt was raised continually throughout the proceedings."  (Id. at

12   16-17.)  Finally, petitioner directs the court's attention to his trial counsel's opening argument, in

13   which she asserted that the evidence did not conclusively prove petitioner's guilt.  (Id. at 19-20.)

14           **1.  Procedural Bar**

15       Petitioner raised his insufficiency of the evidence claim for the first time in his habeas

16   petition filed in the California Supreme Court.  As set forth above, the Supreme Court denied that

17   petition with a citation to five cases, including In re Lindley, 29 Cal.2d 709 (1947).  Lindley

18   "stands for the California rule that a claim of insufficiency of evidence can only be considered on

19   direct appeal, not in habeas proceedings."  Carter v. Giurbino, 385 F.3d 1194, 1196 (9th Cir.

20   2004).  Respondent argues that the California Supreme Court's citation to In re Lindley in

21   denying the habeas petition filed in that court constitutes a state procedural bar precluding this

22   court from addressing the merits of petitioner's insufficiency of the evidence claim.  (ECF No.

23   18-1 at 8-9.)

24       As a general rule, "[a] federal habeas court will not review a claim rejected by a state

25   court 'if the decision of [the state] court rests on a state law ground that is independent of the

26   federal question and adequate to support the judgment."  Walker v. Martin, 562 U.S.___, ___,

27

---

28   [6]   Page number citations such as this one are to the page numbers reflected on the court's
     CM/ECF system and not to page numbers assigned by the parties.

1    131 S. Ct. 1120, 1127 (2011) (quoting Beard v. Kindler, 558 U.S. 53, 55 (2009). See also Maples

2    v. Thomas, ___U.S.___, ___, 132 S. Ct. 912, 922 (2012); Greenway v. Schriro, 653 F.3d 790,

3    797 (9th Cir. 2011); Calderon v. United States District Court (Bean), 96 F.3d 1126, 1129 (9th Cir.

4    1996) (quoting Coleman v. Thompson, 501 U.S. 722, 729 (1991)).  However, a reviewing court

5    need not invariably resolve the question of procedural default prior to ruling on the merits of a

6    claim.  Lambrix v. Singletary, 520 U.S. 518, 524-25 (1997); see also Franklin v. Johnson, 290

7    F.3d 1223, 1232 (9th Cir. 2002) ("Procedural bar issues are not infrequently more complex than

8    the merits issues presented by the appeal, so it may well make sense in some instances to proceed

9    to the merits if the result will be the same"); Busby v. Dretke, 359 F.3d 708, 720 (5th Cir. 2004)

10   (noting that although the question of procedural default should ordinarily be considered first, a

11   reviewing court need not do so invariably, especially when the issue turns on difficult questions

12   of state law).  Thus, where deciding the merits of a claim proves to be less complicated and time-

13   consuming than adjudicating the issue of procedural default, a federal habeas court may exercise

14   discretion in its management of the case to reject the claim on its merits and forgo an analysis of

15   procedural default.  See Batchelor v. Cupp, 693 F.2d 859, 864 (9th Cir. 1982) (procedural default

16   issues "are almost always more complicated and time consuming than are the merits of the

17   petitioner's federal claim").

18          Under the circumstances presented here, this court finds that petitioner's sufficiency of the

19   evidence claim can be resolved more easily by addressing it on the merits. [7]

20                    **2.  Applicable Legal Standards for Claims of Insufficient Evidence**

21          The Due Process Clause "protects the accused against conviction except upon proof

22   beyond a reasonable doubt of every fact necessary to constitute the crime with which he is

23

24   [7]  Respondent points out that the Ninth Circuit has ruled that the rule set forth in Lindley is "an
     independent and adequate state procedural bar."  Carter, 385 F.3d at 1198.  However, in the
25   instant case petitioner raised three claims in his state habeas petition and the California Supreme
     Court denied the entire petition with a citation to five different state court cases.  That
26   differentiates this case from Carter, where the petitioner alleged only one claim and the California
     courts rejected that claim with a sole citation to Lindley.  Id. at 1196.  In light of these
27   differences, the California Supreme Court's citation to In re Lindley in this case does not
     necessarily establish a valid procedural bar.
28

                                                  11

1   charged." In re Winship, 397 U.S. 358, 364 (1970).  There is sufficient evidence to support a

2   conviction if, "after viewing the evidence in the light most favorable to the prosecution, any

3   rational trier of fact could have found the essential elements of the crime beyond a reasonable

4   doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979).  "[T]he dispositive question under

5   Jackson is 'whether the record evidence could reasonably support a finding of guilt beyond a

6   reasonable doubt.'" Chein v. Shumsky, 373 F.3d 978, 982 (9th Cir. 2004) (quoting Jackson, 443

7   U.S. at 318).  Put another way, "a reviewing court may set aside the jury's verdict on the ground

8   of insufficient evidence only if no rational trier of fact could have agreed with the jury." Cavazos

9   v. Smith, ___ U.S. ___, ___,132 S. Ct. 2, 4 (2011).

10         In conducting federal habeas review of a claim of insufficiency of the evidence, "all

11   evidence must be considered in the light most favorable to the prosecution." Ngo v. Giurbino,

12   651 F.3d 1112, 1115 (9th Cir. 2011).  "Jackson leaves juries broad discretion in deciding what

13   inferences to draw from the evidence presented at trial," and it requires only that they draw

14   "'reasonable inferences from basic facts to ultimate facts.'" Coleman v. Johnson,___ U.S. ___,

15   ___, 132 S. Ct. 2060, 2064 (2012) (citation omitted).  "'Circumstantial evidence and inferences

16   drawn from it may be sufficient to sustain a conviction.'" Walters v. Maass, 45 F.3d 1355, 1358

17   (9th Cir. 1995) (citation omitted).[8]

18         "A petitioner for a federal writ of habeas corpus faces a heavy burden when challenging

19   the sufficiency of the evidence used to obtain a state conviction on federal due process grounds."

20   Juan H. v. Allen, 408 F.3d 1262, 1274 (9th Cir. 2005).  In order to grant relief, the federal habeas

21   court must find that the decision of the state court rejecting an insufficiency of the evidence claim

22   reflected an objectively unreasonable application of Jackson and Winship to the facts of the case.

23   Ngo, 651 F.3d at 1115; Juan H., 408 F.3d at 1275 & n.13.  Thus, when a federal habeas court

24   assesses a sufficiency of the evidence challenge to a state court conviction under AEDPA, "there

25   /////

26

27   ───────────────
    [8]  The federal habeas court determines sufficiency of the evidence in reference to the substantive
    elements of the criminal offense as defined by state law.  Jackson, 443 U.S. at 324 n.16; Chein,
28   373 F.3d at 983.

1    is a double dose of deference that can rarely be surmounted." Boyer v. Belleque, 659 F.3d 957,

2    964 (9th Cir. 2011).

3                              **3. Analysis**

4           Based on the evidence introduced at petitioner's trial, as summarized by the California

5    Court of Appeal above, a rational trier of fact could have found beyond a reasonable doubt that

6    petitioner committed the crimes he was charged with committing.  The victim testified in detail

7    about the sexual assault and identified petitioner as her assailant.  The evidence established that

8    the victim suffered injuries consistent with a sexual assault.  Stains on petitioner's shirt matched

9    the victim's DNA profile.  All of this evidence supported the jury's verdict.  The fact that there

10   was also evidence tending to support the defense theory that the physical contact between

11   petitioner and the victim may have been consensual, is not dispositive of petitioner's

12   insufficiency of the evidence claim.  What is dispositive is that the evidence of record, considered

13   in the light most favorable to the prosecution, reasonably supports a finding of guilt beyond a

14   reasonable doubt of the charged crimes.  Chein, 373 F.3d at 982.

15          The decision of the California Court of Appeal rejecting petitioner's claim that the

16   evidence introduced at his trial was insufficient to support his conviction on the charges brought

17   against him is not contrary to or an unreasonable application of Jackson and In re Winship to the

18   facts of this case.  In light of the evidence introduced at petitioner's trial, this court cannot

19   conclude that "no rational trier of fact could have agreed with the jury."  Smith, 132 S. Ct. at 4.

20   See also Coleman, 132 S. Ct. at 2062 (quoting Cavazos, 132 S. Ct. at 4).

21   Accordingly, petitioner is not entitled to federal habeas relief on this claim.

22          **B. Marsden Hearings**

23          In his other claim for federal habeas relief, petitioner argues that the trial court violated his

24   Sixth Amendment right to counsel by failing to hold adequate hearings on his requests for

25   substitute counsel.  (ECF No. 1 at 4, 69-82.)  Petitioner raised this claim on direct appeal.  The

26   California Court of Appeal fairly summarized petitioner's arguments, and explained its ruling

27   rejecting those arguments, as follows:

28   /////

**Marsden Error Analysis**

Defendant argues that the court twice erred in failing to hold <u>Marsden</u> hearings, once during trial, and once postverdict. After examining the context in which defendant made his requests to fire his attorney, we conclude that the trial court did err, but any error was harmless beyond a reasonable doubt, as discussed below.

**Marsden Motion During Trial**

While defense counsel was giving her opening statement, defendant interrupted her to say, "Excuse me, Judge, I want to fire her please." The following exchange then occurred:

THE COURT: "Sir, I want you to be quiet. Let your lawyer speak, please.

DEFENDANT: "Oh, my God, are you with me or against me?

THE COURT: "Mr. Qahhaz, I want you to be quiet.

DEFENDANT: "I want to take the stand. I want to take the stand.

THE COURT: "Mr. Qahhaz, I want you to be quiet, all right?

DEFENDANT: "I want to take the stand. This is my life.

THE COURT: "Sir—

DEFENDANT: "I have to explain to them everything.

THE COURT: "Sir, I want you to be quiet. Okay. Mr. Qahhaz, be quiet. Okay. Thank you very much, sir. You be quiet. You've got to behave yourself, Mr. Qahhaz, if you want to remain. If you don't, I'm going to send you on out of here. So please relax. Thank you very much, sir. I know you don't enjoy this, but just sit down. [¶] You go ahead, [Defense Counsel]."

After defense counsel concluded her remarks, a hearing was held outside the jury's presence during which the court admonished defendant at length about speaking out while trial was in session. Defendant tried unsuccessfully several times to interrupt the court. Eventually, the court permitted him to speak. Defendant stated: "When he said about the blood and stuff, there is never blood. And about the stand, I want to take the stand. I can, you know, I want to tell everybody, you know, what happened exactly." The court responded, "Well, you may take the stand," before continuing to admonish defendant about interrupting trial. The court then explained the order of trial concluding with: "At some point, [the prosecutor's] going to be done. And then, on your behalf, she can put on some testimony. That may include you. The two of you have to talk about that. I don't know what her advice to you is, but we'll cross that bridge when we get to it. But it ain't going to be today, and it probably won't be tomorrow." Trial resumed.

14

On the following day, before testimony resumed, defense counsel, the prosecutor, and the court discussed the court reporter's uncertified draft of defendant's previous day statement. No one but the court reporter and Detective Herndon had heard defendant say he wanted to fire his attorney.

After other matters were discussed, defendant was brought into the courtroom. The court said, "[O]ne of the things you said yesterday, among a lot of things you said, [is] that you wanted to fire your lawyer." After more discussion of other matters, the court asked defendant, "Did you want to fire her?" Defendant replied, "Just, I want her to swear in front of you that she protect me from her heart. *That's all*." (Italics added.) The court went on to tell defendant that defense counsel had been in practice before the court for 20 years, was a good lawyer, ethical, and smart, and that juries seemed to like her. Defense counsel did not swear, but defendant did not say anything more when the court asked the prosecutor if he was ready to call his first witness.

Defendant argues that at this juncture the trial court had a duty under Marsden, supra, 2 Cal.3d 118, to allow defendant to "voice his dissatisfaction with his trial counsel" and conduct a hearing outside the presence of the prosecutor, where defendant "could speak freely about the facts of the case." We agree with defendant that Marsden imposes on the trial court a duty to afford the defendant "the opportunity to tell the trial judge the reasons underlying his belief that his appointed attorney was providing ineffective assistance of counsel." (People v. Sanchez (2011) 53 Cal.4th 80, 87 (Sanchez).) This is so because "the trial court cannot thoughtfully exercise its discretion in this matter without listening to his reasons for requesting a change of attorneys. A trial judge is unable to intelligently deal with a defendant's request for substitution of attorneys unless he is cognizant of the grounds which prompted the request." (Marsden, supra, 2 Cal.3d at p. 123.) However, this duty must be triggered by something that gives the court "'at least some clear indication by defendant,' either personally or through his current counsel, that defendant 'wants a substitute attorney.'" (Sanchez, supra, 53 Cal.3d at p. 90. See also People v. Martinez (2009) 47 Cal.4th 399, 421 [no duty to conduct a Marsden inquiry on court's own motion].)

In this case, however, sometime between the time defendant interrupted defense counsel's opening statement to say he wanted to fire her, and the next day, defendant evidently changed his mind. During the hearing after defense counsel's opening statement, defendant talked about the blood evidence and his desire to explain to the jury what really happened, but he did not express dissatisfaction with his attorney, or repeat his request to fire her, or ask for substitute counsel. Similarly, when the court asked him the next day whether he did want to fire his attorney, he replied, "Just, I want her to swear in front of you that she protect me from her heart. *That's all*." (Italics added.) We note defendant had previously made a Marsden motion to fire his first attorney and the court had

/////

15

held a Marsden hearing.[9]  The record here demonstrates defendant knew how to indicate he wanted substitute counsel, and the trial court did afford defendant two opportunities – one immediately after defense counsel's opening statement, and one the next day – to explain why he wanted to fire his attorney.  At those points in time, defendant gave no indication he wanted to fire her and, when asked directly whether he did want to fire her, he effectively said he did not.   Given that defendant did not give the court any clear indication at either point in time that he wanted to substitute attorneys, the court had no further obligation to hold a Marsden hearing to probe defendant's reasons for having apparently felt differently about his counsel during her opening statement.

**Postconviction Marsden Motion**

The jury returned its verdicts on April 19, 2010.  On May 13, 2010, the day defendant's Romero motion was scheduled to be heard, defense counsel "wanted to make a record as to whether the court thought it prudent to appoint counsel to determine if there is a new trial motion" on the issue of her own ineffective assistance.  The court did not appoint other counsel, and continued the matter to May 20.

On May 20, trial counsel filed a motion to continue sentencing.  In her declaration in support of the motion, she stated that on May 13 she informed the court that defendant was requesting a Marsden hearing so that he could request new counsel and a new trial, but the court, outside defendant's presence, declined to hold a hearing that day.  On defendant's behalf, she was renewing his request for a Marsden hearing.  She averred that defendant had refused to meet with her since the verdicts were returned, and she "believe[d] the relationship with Mr. Qahhaz cannot be repaired until he has had an opportunity to air his grievances with the court and hear the court's analysis of my legal assistance at trial."

Both trial counsel and proposed interim counsel appeared in court on May 20.  Although it was the last day for sentencing without a time waiver, defendant was not brought to court from the jail.  Trial counsel reminded the court defendant wanted to be heard on his Marsden motion, and urged the court to appoint someone to look into filing a motion for new trial.  When the court asked counsel if there was a "viable issue" that would give rise to "an affirmative duty to appoint somebody," trial counsel replied:  "Let me just offer this, there were a lot of negotiations with him over whether he would testify.  Ultimately, he decided not to.  And now I think he regrets that decision.  So his issue is over my advice and maybe another lawyer looking at that might think it was ill advised to tell him not to testify."   The court appointed Ms. Barton and the conflict defender's office "for the sole purpose of viewing the record and/or discussions with the defendant and/or [trial counsel],

---

[9]   The court denied that Marsden motion and proceedings were suspended after the trial court declared a doubt about defendant's competency.  When proceedings resumed two and a half months later, defendant was represented by different counsel.

or anyone, for a motion for a new trial based on ineffective assistance of counsel."

On May 21, 2010, the court confirmed Ms. Barton's appointment "to look into [a] possible motion for new trial." Defendant and both trial and interim counsel appeared in court on that day. Trial counsel waived time for sentencing on defendant's behalf, and sentencing was continued to July 1 to permit her to file a sentencing motion. Defendant did not voice an opposition to the dual counsel procedure.

On July 1, defendant appeared in court with trial counsel. Ms. Loy, standing in for Ms. Barton, was also present. As soon as trial counsel started to speak, defendant apparently became agitated and interrupted her, stating " Marsden motion, please. Please, Judge, on her," meaning trial counsel. Defendant was removed from the court room to calm down and the matter was passed. When proceedings resumed, the court asked all counsel: "[G]enerally when a defendant brings a Marsden motion, it's important that the court address that and listen to the defendant and so forth. But would that apply at this time?" Trial counsel stated," I think not because the issue is being looked into. He has other counsel right now . . . . So unless he were bringing it against interim counsel, I don't think so." She opined that if, after looking into the matter, interim counsel decided not to file a motion for new trial, at that point trial counsel would still be defendant's attorney and "[a]t that time, I think his motion would have merit." The prosecutor agreed. The court continued sentencing for three weeks to allow interim counsel to prepare a new trial motion.

On July 23, 2010, both trial counsel and interim counsel appeared. Interim counsel indicated she had spoken with defendant that morning and that trial counsel was "the source of most of [defendant's] problems when he comes out here." She indicated she was almost ready to file the new trial motion, but that she and defendant were having "a little disagreement." She asked to be appointed for all purposes, not just for the limited purpose of filing a new trial motion, because defendant wanted trial counsel off the case for all intents and purposes. When asked by the court how she and defendant were "getting along," trial counsel replied that she and defendant had "no relationship" and there was "no communication." Trial counsel had no objection to the court appointing interim counsel for all purposes. The court then relieved trial counsel, appointed interim counsel for all purposes, called defendant into the courtroom and informed him of the substitution of attorneys for all purposes. Defendant made no comment. The court continued the matter to September 3 for hearing on the new trial motion.

On September 3, the hearing on the new trial motion was continued to September 30. On September 30, however, new counsel informed the court that the new trial motion was ready to file except that defendant was refusing to sign the declaration in support of the allegations of ineffective assistance of counsel made in the motion. She represented that defendant did not disagree with the contents of

17

the declaration.  "He disagrees that those are the only bases, and there's a variety of other issues that I have explored that, as the attorney, I would say are not valid."  She asked the court to appoint an additional local defense attorney to assist her in working with defendant.  The court appointed the new attorney on that limited basis and continued the matter to October 7, 2010.  On that date, however, defendant still had not signed the declaration, and he now wanted the new attorney to visit him in jail, read the trial transcript, and give his opinion.  The prosecutor objected to putting off the sentencing further.  The court continued the matter for two weeks for judgment and sentence.

As of October 21, 2010, defendant continued to refuse to sign the declaration in support of the new trial motion.  No new trial motion was ever filed.  The court proceeded to hear defendant's <u>Romero</u> motion, which had been filed by trial counsel.  Current counsel submitted the motion on the pleadings.  The court denied the <u>Romero</u> motion and sentenced defendant.

Defendant apparently argues that the court erred by failing to hold a <u>Marsden</u> hearing on July 1, 2010.  That was the day on which "the court, with only the input of the counsel at whom the <u>Marsden</u> was directed, argued against her being relieved as counsel of record, citing to the existence of counsel who had been appointed to consider filing a new trial motion."  In our view, if the court erred, any error was harmless beyond a reasonable doubt, as we now explain.

"[A]t any time during criminal proceedings, if a defendant requests substitute counsel, the trial court is obligated, pursuant to [the] holding in <u>Marsden</u>, to give the defendant an opportunity to state any grounds for dissatisfaction with the current appointed attorney."  (<u>Sanchez, supra</u>, 53 Cal. 4th at p. 90.)  It is clear now, as it may not have been in 2010, that "if the defendant makes a showing during a <u>Marsden</u> hearing that his right to counsel has been ""'substantially impaired'"" [citation], substitute counsel must be appointed as attorney of record *for all purposes*.  [Citation.]  In so holding, we specifically disapprove of the procedure adopted by the trial court in this case, namely, the appointment of a substitute or 'conflict' attorney solely to evaluate whether a criminal defendant has a legal ground on which to move to withdraw the plea on the basis of the current counsel's incompetence."  (<u>Ibid</u>., italics added.)  We assume that the Supreme Court's reasoning in the <u>Sanchez</u> decision applies to trials, as well as pleas, and that it would equally disapprove the practice used in this case of appointing substitute counsel for the sole purpose of evaluating whether a criminal defendant has a legal basis for bringing a new trial motion on the grounds that trial counsel was incompetent.

According to trial counsel's declaration in support of a request to continue sentencing from May 20 to June 25, defense counsel first informed the trial court of defendant's latest motion on May 13.  According to counsel's declaration, defendant was not present when she informed the court of his request for a <u>Marsden</u> hearing, or when she made an "on the record" request for appointment of

interim counsel, which the trial court denied.[10]   The record on appeal is not clear on whether defendant was brought to court from jail on May 13.  Obviously, if defendant was not present in the court house, the court could not have held a <u>Marsden</u> hearing on May 13.

Any failure to hold a <u>Marsden</u> hearing on May 13 was rendered moot on May 20, when the trial court did appoint substitute counsel, albeit for the limited purpose of looking into a new trial motion based on trial counsel's ineffective assistance.  The record is clear defendant was not brought into court from the jail that day and, therefore, no <u>Marsden</u> hearing could have been held.  But by appointing counsel on the basis of trial counsel's comments, the trial court gave defendant almost everything that he could have gotten if the court had held the hearing and granted his <u>Marsden</u> motion.

Instead of appointing interim counsel on the basis of trial counsel's statements in court and in her motion to continue, the court should have held a <u>Marsden</u> hearing to allow defendant to air his complaints about trial counsel.  Had the court done so, it might have concluded that "'""failure to replace counsel would substantially impair the defendant's right to assistance of counsel.""' [Citations.]   Substantial impairment of the right to counsel can occur when the appointed counsel is providing inadequate representation or when 'the defendant and the attorney have become embroiled in such an irreconcilable conflict that ineffective representation is likely to result . . . .' [Citations.]" (<u>People v. Myles</u> (2012) 53 Cal. 4th 1181, 1207, quoting <u>People v. Clark</u> (2011) 52 Cal. 4th 856, 912.  <u>See also People v. Robles</u> (1970) 2 Cal. 3d 205, 215 ( Robles ) ["in a few cases the disagreement as to whether a defendant should testify may signal a breakdown in the attorney–client relationship of such magnitude as to jeopardize the defendant's right to effective assistance of counsel."].)   In either case, the court would have been obligated under <u>Marsden</u> to appoint substitute counsel for all purposes, not a limited purpose, at that juncture.

It is true that on July 1, the court missed another opportunity to hold a <u>Marsden</u> hearing which might have led to interim counsel's appointment for all purposes.   However, the court's error in appointing interim counsel for a limited purpose instead of all purposes was remedied for once and for all on July 23, when the court did relieve trial counsel and appoint Ms. Barton for all purposes.  From this point forward, defendant had achieved all that he could have from <u>Marsden</u> hearings on May 13, May 21, or July 1, 2010:  substitute counsel, for all purposes.

Defendant acknowledges that Ms. Barton represented him for all purposes, including sentencing, from that point forward.  However, he argues he was prejudiced because she was "appointed as [defendant's] attorney for all purposes *just shortly* before

---

[10]   The record suggests defendant was scheduled to appear the following day, May 14, for sentencing, but that the court vacated that date and continued sentencing to May 20.

1
2
3
4
5
6
7
8

> [defendant's] sentencing, and in fact made no arguments on
> [defendant's] behalf . . . ." (Italics added.) Sentencing finally took
> place October 21, 2010, nearly three months after Ms. Barton's
> appointment for all purposes was made. Defendant did not express
> any desire to fire Ms. Barton, and the trial court did not have a sua
> sponte duty to "ascertain whether the relationship between Barton
> and [defendant] was beyond repair." Nor has defendant
> demonstrated on this record that Ms. Barton rendered ineffective
> assistance of counsel in connection with the sentencing hearing or
> the decision not to file a motion for new trial. In any event, the trial
> court even acceded to Ms. Barton's request for the appointment of
> yet another attorney to help her deal with defendant. Any Marsden
> error was, on this record, harmless beyond a reasonable doubt.
> (Sanchez, supra, 53 Cal. 4th at p. 92.)

9   Qahhaz, 2012 WL 4459579, at **3 -8.

10           **1. Applicable Law**

11          Pursuant to the decision in People v. Marsden, 2 Cal. 3rd 118 (1970), when a criminal

12   defendant in California asserting inadequate representation seeks to discharge appointed counsel

13   and substitute another attorney, the trial court must permit him to explain the basis of his

14   contention and to relate specific instances of the attorney's inadequate performance. The denial

15   of a Marsden motion to substitute counsel can implicate a criminal defendant's Sixth Amendment

16   right to counsel and is properly considered in federal habeas corpus. Bland v. California Dep't of

17   Corrections, 20 F.3d 1469, 1475 (9th Cir. 1994), overruled on other grounds by Schell v. Witek,

18   218 F.3d 1017 (9th Cir. 2000) (en banc). On federal habeas review, the relevant inquiry is

19   whether the state trial court's disposition of the Marsden motion violated petitioner's Sixth

20   Amendment right to counsel because a conflict between petitioner and his attorney "had become

21   so great that it resulted in a total lack of communication or other significant impediment that

22   resulted in turn in an attorney-client relationship that fell short of that required by the Sixth

23   Amendment." Schell, 218 F.3d at 1027-28. As the Ninth Circuit has explained:

24
25
26
27

> [T]he basic question is simply whether the conflict between Schell
> and his attorney prevented effective assistance of counsel . . . . It
> may be the case, for example, that because the conflict was of
> Schell's own making, or arose over decisions that are committed to
> the judgment of the attorney and not the client, in fact he actually
> received what the Sixth Amendment required in the case of an
> indigent defendant . . . .

28   Schell, 218 F.3d at 1026.

1      The Sixth Amendment does not guarantee a "meaningful relationship" between a client

2   and his attorney.  Stenson v. Lambert, 504 F.3d 873, 886 (9th Cir. 2007) (quoting Morris v.

3   Slappy, 461 U.S. 1, 14 (1983)).  Moreover, an indigent defendant does not have the right to

4   counsel of his choice in a criminal proceeding.  United States v. Rewald, 889 F.2d 836, 856. (9th

5   Cir. 1989); United States v. Torres–Rodriguez, 930 F.2d 1375, 1380 n.2 (9th Cir.1991) ("A

6   defendant who seeks to replace one appointed counsel with another . . . will need to justify the

7   replacement . . . .  An indigent defendant is entitled to appointed counsel, but not necessarily to

8   appointed counsel of his choice."); see also Bradley v. Henry, 510 F.3d 1093, 1099-1100 (9th Cir.

9   2007) (concurring opinion).  "[I]n evaluating Sixth Amendment claims, the appropriate inquiry

10  focuses on the adversarial process, not on the accused's relationship with his lawyer as such."

11  Wheat v. United States, 486 U.S. 153, 159 (1988) (quoting United States v. Cronic, 466 U.S. 648,

12  657 n. 21 (1984)).  Thus, "the essential aim of the [Sixth] Amendment is to guarantee an effective

13  advocate for each criminal defendant."  Id.

14      The United States Supreme Court has not specifically addressed the level of inquiry

15  required when a Marsden motion or other similar motion is made by a criminal defendant.  When

16  assessing a trial court's ruling on a Marsden motion in the context of a federal habeas corpus

17  proceeding, the Ninth Circuit has held that the Sixth Amendment requires only "an appropriate

18  inquiry into the grounds of such a motion, and that the matter be resolved on the merits before the

19  case goes forward."  Schell, 218 F.3d at 1025.  See also Larson v. Palmateer, 515 F.3d 1057,

20  1066-67 (9th Cir. 2008) ("Because Larson has not shown that he was entitled to a fourth set of

21  counsel under clearly established federal law, his Sixth Amendment claim fails."); Plumlee v.

22  Masto, 512 F.3d 1204, 1211 (9th Cir.) (en banc) ("Under our precedents, see, e.g., Schell, 218

23  F.3d at 1025-26, Judge Lane had a duty to inquire into the problems with counsel when they were

24  first raised, and he did so"), cert. denied 553 U.S. 1085 (2008).

25          **2. Analysis**

26      As explained by the California Court of Appeal, petitioner claims that the trial court erred

27  in failing to conduct a Marsden hearing after he stated he wanted to fire his attorney, both during

28  trial and after the jury returned their guilty verdicts.  To the extent petitioner is raising in this

21

1   court issues regarding the proper application of state law, they are not cognizable in a federal

2   habeas corpus proceeding.  Swarthout v. Cooke, 562 U.S. 216, ___, 131 S. Ct. 859, 863 (2011);

3   McGuire, 502 U.S. at 67-68.  A petitioner may not transform a state law issue into a federal one

4   by simply asserting a violation of due process.  Langford v. Day, 110 F.3d 1380, 1389 (9th Cir.

5   1996).   Thus, whether the state trial court violated state law under the Marsden decision by, for

6   example, initially appointing an interim attorney solely for the purpose of filing a motion for new

7   trial and not for all purposes, is not cognizable in these federal habeas proceedings.  Rather, this

8   court must determine only whether the trial judge's actions deprived petitioner of his Sixth

9   Amendment right to the effective assistance of counsel.

### a. First Request for Substitute Counsel

11          The state court record reflects, and the California Court of Appeal found, that during his

12   own trial counsel's opening statement petitioner interrupted to state, "Excuse me, Judge, I want to

13   fire her, please."  (ECF No. 19-3 at 183.)  The next morning, during a conversation held outside

14   the jury's presence, it was established that the trial judge did not hear this statement made by

15   petitioner.  (Id. at 240.)   Accordingly, the judge summoned petitioner into the courtroom and

16   asked him whether he wanted to fire his lawyer.  (Id. at 254.)  As noted by the state appellate

17   court, petitioner responded that he wanted his counsel "to swear in front of you that she protect

18   me from her heart.  That's all."  (Id.)  The judge then made a few general comments, speaking

19   favorably as to the legal abilities and trial skills of petitioner's lawyer, and then asked the

20   prosecutor whether he was ready to call his first witness.  (Id. at 244-45.)  The trial proceeded

21   with no further discussion or objection by petitioner to going forward with his then current

22   counsel.

23          After reviewing this record, the California Court of Appeal concluded that between the

24   time petitioner interrupted her opening statement and asked to "fire" his lawyer and the point

25   where the trial judge realized that such a request had been made and questioned petitioner about

26   it, petitioner had changed his mind and was willing to proceed with his then current counsel.  In

27   other words, the state appellate court concluded that the trial judge was never faced with a valid

28   Marsden request for substitute counsel at that time and therefore had no duty to make further

1    inquiry.  This determination is not objectively unreasonable, given the facts of this case.  The trial

2    judge certainly cannot be faulted for failing to respond to a request that he didn't hear.  Moreover,

3    the trial judge was entitled to take petitioner at his word when he informed the judge the only

4    thing he wanted was for his attorney to represent him "from the heart."  The undersigned also

5    notes that when the trial judge allowed petitioner to speak in open court after being informed that

6    petitioner had said something about wanting to "fire" his attorney, petitioner did not repeat that

7    request to fire his counsel nor did he complain about his trial counsel's performance at that time.

8    As noted by the state appellate court, a trial court is not obliged to hold a <u>Marsden</u> hearing unless

9    there is "at least some clear indication by the defendant, either personally or through his current

10   counsel, that defendant wants a substitute attorney."  <u>Qahhaz</u>, 2012 WL 4459579, at *4 (quoting

11   <u>People v. Sanchez</u>, 53 Cal. 4th 80, 90 (2011).  This court agrees with the California Court of

12   Appeal that, without a valid request for substitute counsel, the trial court "had no further

13   obligation to hold a <u>Marsden</u> hearing to probe defendant's reasons for having apparently felt

14   differently about his counsel during her opening statement."  <u>Qahhaz</u>, 2012 WL 4459579 at *5.

15        The facts of this case also support a finding that petitioner simply abandoned any initial

16   request for substitute counsel.  In <u>People v. Vera</u>, 122 Cal.App.4th 970 (2004), the California

17   Court of Appeal held that the defendant had abandoned his request for substitute counsel where

18   he failed to renew his previously unresolved <u>Marsden</u> motion when invited to do so.  <u>Id.</u> at 981.

19   Similarly here, petitioner failed to pursue his request for substitute counsel even when asked

20   directly by the trial court thereafter whether he wished to fire his attorney.  To the extent that

21   petitioner effectively abandoned any initial request for substitute counsel, the trial court certainly

22   had no duty to hold a <u>Marsden</u> hearing.  <u>See</u> <u>Brown v. Walker</u>, No. C 09-4663 JSW (PR), 2011

23   WL 4903085, at *6-7 (N.D. Cal. Oct. 14, 2011) (petitioner abandoned his request for substitute

24   counsel where, after writing an ex parte letter to the trial court requesting a "<u>Marsden</u> hearing," he

25   subsequently pled guilty without renewing his request).

26        In any event, the question before the court in this federal habeas proceeding is whether the

27   trial court's failure to hold a hearing on petitioner's request for substitute counsel violated the

28   Sixth Amendment in that a conflict between petitioner and his trial counsel "had become so great

23

1   that it resulted in a total lack of communication or other significant impediment." Schell, 218

2   F.3d at 1026.  Petitioner is unable to make this showing.  Although petitioner blurted out at one

3   point that he wanted to "fire" his trial counsel, he did not repeat that request when the trial judge

4   subsequently asked him directly whether he still wished to do so.  On the contrary, petitioner

5   proceeded through the remainder of his trial represented by his then current trial counsel without

6   protest or complaint.  Those actions belie any argument that petitioner and his trial counsel had an

7   irreconcilable conflict at the time of petitioner's trial.  Because petitioner has failed to show that

8   the trial court's failure to conduct a full Marsden hearing following his trial counsel's opening

9   statement resulted in a violation of petitioner's Sixth Amendment right to counsel, he is not

10  entitled to federal habeas relief on this claim.[11]

11                          **b.  Second Request for Substitute Counsel**

12         With regard to petitioner's post-trial requests for substitute counsel, the California Court

13  of Appeal concluded that the trial court erred in not affording petitioner a hearing, but that any

14  such error was harmless.  The state appellate court reasoned that petitioner ultimately received

15  what he had asked for, the appointment of substitute counsel for all purposes, notwithstanding the

16  trial court's failure to allow him to explain the basis of his grievances against his trial counsel at

17  that time.

18         The record in this case reflects that after the jury rendered its guilty verdict on all counts,

19  the conflict between petitioner and his trial counsel had reached the point where there was a total

20  lack of communication.  Essentially, a meaningful attorney-client relationship no longer existed at

21  that point.  Petitioner wanted to discharge his trial counsel and obtain another attorney.  He also

---

22  [11]   Petitioner asserts that he wanted to testify at his trial and there is evidence in the record that

23  this issue was discussed extensively between petitioner and his trial counsel.  Specifically, counsel told the trial court that after numerous discussions on this point, petitioner ultimately

24  agreed not to testify but then regretted that decision after the verdict was rendered.  This situation, which involves communication and negotiation between petitioner and his attorney, does not

25  constitute a constructive denial of counsel.  The fact that petitioner and his trial counsel initially disagreed as to whether petitioner should testify at trial and that his counsel ultimately convinced

26  petitioner not to do so, does not render counsel's representation constitutionally inadequate.

27  Given the facts of this case, counsel's advice to petitioner not to testify was not an error "'so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.'" Richter, 131 S.

28  Ct. at 787-88. (quoting Strickland v. Washington, 466 U.S. 668, 687 (1984)).

1   wanted to take the stand and testify.  Although the trial court did not hear directly from petitioner

2   about the problems between himself and his trial counsel, counsel herself explained to the court

3   that petitioner wanted a substitution of attorneys and that the problem between them concerned

4   petitioner's desire to testify in his own defense.[12]  At that point, the trial court provided petitioner

5   with one, and eventually two, additional attorneys to evaluate the advisability of filing a motion

6   for new trial on the grounds that he had received ineffective assistance of trial counsel.  Petitioner

7   did not object to that procedure.  Subsequently, well prior to his sentencing, the trial court

8   appointed new substitute counsel to represent petitioner for all purposes.  Thus, although

9   petitioner's trial counsel was still technically one of his attorneys of record from the point at

10  which she articulated petitioner's request for substitute counsel until almost three months before

11  his sentencing hearing, the trial court's appointment of substitute counsel shortly after hearing

12  from trial counsel that petitioner wanted another attorney, in effect, granted petitioner's Marsden

13  motion.

14          More importantly, there is no evidence the trial court's actions deprived petitioner of his

15  right to the effective assistance of counsel following his trial.  There is no indication that the

16  performance of either one of the substitute counsel appointed by the trial court for the post-trial

17  proceedings was deficient or ineffective.  One of the substitute attorneys drafted a motion for new

18  trial and presumably would have filed it with the court if petitioner had agreed to sign the

19  supporting declaration that counsel had drafted.  There is also no indication that counsel's

20  performance at the sentencing proceedings was deficient nor is there any evidence of a conflict

21  between petitioner and either of his substitute counsel throughout the post-trial proceedings.

22  Petitioner has failed to demonstrate either the existence of a serious post-trial conflict rising to the

23  level of a constructive denial of counsel, or even that he was prejudiced by any less serious

24  conflict between himself and his counsel.  See Schell, 218 F.3d at 1027-28 (if a serious conflict

25  _____

26  [12]  The fact that petitioner's trial counsel, and not petitioner himself, originally articulated the
    request for the appointment of substitute counsel is not legally significant because counsel was

27  making that request on behalf of petitioner.  See Bland, 20 F.3d at 1477 ("the fact that Anderson
    made the request, and not Bland, does not change the result [because] Anderson made the request

28  on behalf of Bland.").

1    exists that results in a constructive denial of counsel no showing of prejudice is required, but if

2    there is a serious conflict that did not rise to the level of a constructive denial of counsel, a

3    petitioner must prove he was prejudiced by the conflict); see also Brown v. LaMarque, No. 1:03-

4    cv-6870 TAG HC, 2007 WL 570088, at **5-9 (E.D. Cal. Feb. 21, 2007) (petitioner's Sixth

5    Amendment rights were not violated by the trial court's refusal to conduct a Marsden hearing

6    where petitioner failed to show he was denied the effective assistance of counsel).  For all of

7    these reasons, petitioner has failed to demonstrate that the trial judge's failure to allow him to

8    express his complaints about his trial counsel violated petitioner's rights under the Sixth

9    Amendment.

10          Given the record in this case, the state court's denial of petitioner's Sixth Amendment

11   claims was not contrary to or an unreasonable application of federal law, nor was it "so lacking in

12   justification that there was an error well understood and comprehended in existing law beyond

13   any possibility for fairminded disagreement."  Richter,131 S. Ct. at 786-87.  Accordingly,

14   petitioner is not entitled to federal habeas relief with respect to his claims that his constitutional

15   rights were violated by the lack of adequate hearings on his requests for the appointment of

16   substitute counsel on his behalf.

17   **IV.  Conclusion**

18          For the foregoing reasons, IT IS HEREBY RECOMMENDED that petitioner's

19   application for a writ of habeas corpus be denied.

20          These findings and recommendations are submitted to the United States District Judge

21   assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days

22   after being served with these findings and recommendations, any party may file written

23   objections with the court and serve a copy on all parties.  Such a document should be captioned

24   "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

25   shall be served and filed within fourteen days after service of the objections.  Failure to file

26   objections within the specified time may waive the right to appeal the District Court's order.

27   Turner v. Duncan, 158 F.3d 449, 455 (9th Cir. 1998); Martinez v. Ylst, 951 F.2d 1153 (9th Cir.

28   1991).  In his objections petitioner may address whether a certificate of appealability should issue

1  in the event he files an appeal of the judgment in this case.  See Rule 11, Federal Rules Governing

2  Section 2254 Cases (the district court must issue or deny a certificate of appealability when it

3  enters a final order adverse to the applicant).

4  Dated:  November 25, 2014

_Dale A. Drozd_

DALE A. DROZD
UNITED STATES MAGISTRATE JUDGE

DAD:8:
Qahhaz2338.hc

27